## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:21-cv-02776

PRIYA N. WERAHERA,

      Plaintiff,

v.

THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate;

ANN THOR, Chair of the Pathology Department (in her official and individual capacities); and

STEVEN ANDERSON, Vice Chair for Research (in his official and individual capacities),

      Defendants.

---

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

---

      Plaintiff, PRIYA N. WERAHERA, by and through his counsel, KATZ AND KERN LLP, hereby files this Complaint against defendants THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate; ANN THOR, Chair of the Pathology Department (in her official and individual capacities); and STEVEN ANDERSON, Vice Chair for Research (in his official and individual capacities), and in support thereof, states and alleges as follows:

### <u>INTRODUCTION</u>

      Plaintiff Priya N. Werahera ("Plaintiff") is a highly successful research professor currently employed at the University of Colorado ("CU"). Throughout the course of his employment with CU, Plaintiff has suffered from discrimination, a hostile work environment, adverse job actions and other deleterious terms and conditions of employment, largely at the hands of his supervisors Defendant ANN THOR ("Defendant Thor") and Defendant STEVEN ANDERSON ("Defendant Anderson"). Plaintiff has been repeatedly threatened with baseless termination of his longstanding

position at CU, a threat that is rooted in underlying discriminatory animus. Defendants' actions and inactions continue to poison Plaintiff's employment relationship, and he is on the verge of being terminated absent judicial intervention. Plaintiff's colleagues have experienced similar discriminatory behavior by the individually-named Defendants herein. However, THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate ("Defendant Board") has supported, ratified, and adopted this behavior and has failed to take remedial action consistent with their obligations as CU's governing body.

As a result of Defendants conduct, Plaintiff brings this civil action seeking damages and other relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 20003 *et seq.* ("Title VII"); the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA"); and the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("§ 1983").

## THE PARTIES

1.      Priya N. Werahera, Ph.D. ("Plaintiff") has been employed at CU since 1992, and currently holds joint appointments within CU's Pathology and Bioengineering Departments, both located with CU's School of Medicine ("SOM") at CU's Anschutz Medical Campus in Aurora, Colorado[1].

2.      Plaintiff is a resident of the State of Colorado.

3.      CU is a system of public universities in the State of Colorado consisting of four campuses: University of Colorado Boulder ("CU Boulder"), University of Colorado, Colorado Springs ("UCCS"), University of Colorado Denver ("CU Denver"), and the Anschutz Medical Campus ("Anschutz Medical Campus").

---

[1] While the Bioengineering is physically located at CU Anschutz Medical Campus, it is operated by the University of Colorado Denver

4.      CU is engaged in the business of higher education and is established and regulated by Article IX, §§ 12 and 13, Colorado Constitution and State statutory law, and C.R.S. §§ 23-20-101, *et seq.*  As a public institution, CU subject to the requirements of the Colorado Constitution, the United States Constitution, and applicable federal law.

5.      CU is operated and governed autonomously by Defendant Board.

6.      As provided by the state constitution and state law, Defendant Board, duly elected, constitute a body corporate.

7.      Defendant Board exercises general supervision of CU and, subject to narrow exceptions, it has the exclusive control and direction of all funds of and appropriations to CU.

8.      Defendant Board, as CU's governing body, meets the definition of an "employer" under the applicable statutes, including Title VII and the ADEA.

9.      At all times relevant to this Complaint, Defendant Ann Thor ("Defendant Thor") was and remains Professor of Pathology and Chair of CU's Pathology Department.

10.      Upon information and belief, Defendant Thor is a an American-born Caucasian woman and not of the Buddhist faith/religion.

11.      At all times relevant to this Complaint, Defendant Thor has acted as Plaintiff's superior and supervisor and has decision-making authority as to Plaintiff's continued employment at CU.

12.      At all times relevant to this Complaint, Defendant Thor has acted under color of law in performance of her duties as CU's Pathology Department Chair and is sued in both her official capacity for equitable relief and her individual capacity for money damages.

13.     At all times relevant to this Complaint, Defendant Steven Anderson was and remains Vice Chair for Research of CU's Pathology Department.

14.     Upon information and belief, Defendant Anderson is an American-born Caucasian man and not of the Buddhist faith/religion.

15.     At all times relevant to this Complaint, Defendant Anderson has acted as Plaintiff's superior and supervisor and maintains decision-making authority as to Plaintiff's continued employment at CU.

16.     At all times relevant to this Complaint, Defendant Anderson has acted under color of law in performance of his duties as CU's Department Vice Chair and is sued in both his official capacity for equitable relief and his individual capacity for money damages.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the employment practices alleged to be unlawful were committed in the District of Colorado.

19.     Plaintiff has exhausted all administrative prerequisites to the filing of this action.

20.     More specifically, this lawsuit was commenced within 90 days of Plaintiff receiving a Notice of Right to Sue, dated July 19, 2021, from the United States Equal Employment Opportunity Commission ("EEOC") with respect to the Charge of Discrimination, number 541-2021-01287.

21.     Equitable relief, including issuance of a declaratory judgment and enjoining Defendants from further constitutional violations, is authorized by 28 U.S.C. §§ 2201 and 2202,

Rule 57 of the Federal Rules of Civil Procedure, and the Court's inherent equitable authority.

## FACTUAL ALLEGATIONS

***Plaintiff's Pivotal Role in the Advancement***
***of Prostate Cancer Research***

22.     Plaintiff is a leading researcher and developer of technology to detect prostate cancer, and his research is on the precipice of causing a significant change in how medicine detect prostate cancer.  His current position as Research Associate Professor in CU's Pathology and Bioengineering Departments is one that he earned based on dedicating his career with CU to this objective over the course of almost thirty years.  Quite simply, it is the avenue and the forum that will enable Plaintiff to bring this important and life-saving research to the masses.

23.     Plaintiff is currently sixty-two (62) years of age, and has been employed by CU since 1992, when he was age thirty-three.  For the past thirty years, Plaintiff has cultivated relationships, performed trials, applied for research grants, appealed to donors for the purposes of advancing the science and technology behind prostate cancer research, all of which has been performed on behalf of CU, an institution that has derived the benefit of both the advancement of research and the reputation that research engenders within the world of academia.

24.     Plaintiff's background is significant in terms of understanding the importance and relevance of his current position with CU.  Plaintiff, who was born in Sri Lanka, immigrated to the United States in 1984.  As such, he is a man of South Asian national origin.  He is also a member of the Buddhist faith/religion.

25.     After earning his bachelor's degree in electrical engineering, Plaintiff earned his Ph.D. in Electrical and Computer Engineering in 1994 at the Colorado State University.

26.     Plaintiff began his full-time research career at CU in 1992, when he was recruited by Dr. E. David Crawford, a world-renowned urologist and the late Dr. Gary J. Miller ("Dr. Miller"), a genitourinary pathologist.

27.     Plaintiff was recruited to CU deliberately and specifically based on his unique training and credentials, placing him in a niche and critical position at CU, and making him an integral asset to CU.

28.     In fact, Plaintiff obtained permanent U.S. residency in 1993 under the special category of "National Interest Waiver" due to his work associated with prostate cancer and became a U.S. Citizen in 1998.

29.     In support of Plaintiff's application for permanent residency, CU officials submitted documentation indicating that Plaintiff's work "[would] revolutionize the way in which prostate cancer is diagnosed" and that his work was in "America's national interest".

30.     Both Dr. Miller and CU's Chief Resident of the Division of Urology, Dr. Firouz Daneshgari supported Plaintiff's application, the latter writing to the U.S. Immigration and Naturalization Service and describing how Plaintiff's expertise and technical positions made his participation critical to the continuation and success of his work on behalf of CU.

31.     Plaintiff has spent the past twenty-nine (29) years devoting his research career to Early Detection and Therapy of Prostate Cancer and has been recognized as a renowned leader in clinical translational research in prostate cancer diagnosis and therapy.

32.     Plaintiff's has been published in over forty (40) peer-reviewed journals and conference publications, and has received funding from national research institutes, industry, and donors.

33.   In addition to his accomplishments in prostate cancer research, Plaintiff is also the recipient of a U.S. patent for an optical biopsy needle that can classify benign versus malignant prostatic tissue and can diagnose prostate cancer with very high sensitivity and specificity.

34.   Plaintiff specifically developed a novel computer algorithm and methodology to create equivalent 3D computer models of human prostate specimens.  Using prostate computer models, he demonstrated the efficacy of various prostate biopsy protocols and conducted NIH funded phase I clinical trials to validate the findings.  One of his major accomplishments is the proof-of-concept work regarding template-guided transperineal mapping biopsy protocol to identify low-risk prostate cancer patients.  Plaintiff led a team of investigators that measured prostate tumor growth rates in humans to find out whether there is a difference in growth rates of latent versus aggressive prostate cancer.  He proved that maximum tumor doubling times of latent and prostate tumors are not significantly different, as was previously thought.

35.   In 2008, Plaintiff co-founded Precision Biopsy Inc. ("PBI"), a startup company that developed and licensed optical biopsy needle technology to CU clinic.  PBI raised $38 million and developed ClariCore™ Optical Biopsy System ("ClariCore"), a device designed to improve how biopsies are taken from the prostate by using light sensors (fiber optics) that can see changes in the tissue.  This optical biopsy needle can classify benign versus malignant prostatic tissue and can diagnose prostate cancer with very high sensitivity and specificity.

36.   Under Plaintiff's guidance, PBI successfully completed two (2) clinical trials for ClariCore™ Optical Biopsy System demonstrating the efficacy of this device.  This new technology was intended to go through compulsory FDA clinical trials prior to being distributed worldwide, those of which were expected to be successful.

37.   Plaintiff is the **only** faculty member currently in the Pathology Department who has

conducted multiple clinical trials to translate technologies from Bench-to-Bedside for the benefit of cancer patients.

38.     PBI was privately funded and located on CU's Anschutz Medical Campus.

39.     Significantly, CU maintained ownership of the patent for ClariCore™ Optical Biopsy System from its inception, and in 2020, obtained ownership of the associated technology license and equipment.

40.     Although PBI dissolved in 2019 due to loss of funding CU maintained ownership of the ClariCore™ patent, and in early 2020, agreed to take over funding responsibility for Plaintiff's medical equipment business.[2]

41.     Plaintiff is also a member of the University of Colorado Cancer Center ("UCCC") and a Senior Member of the Institution of Electrical and Electronics Engineers ("IEEE").

42.     As a result of Plaintiff's research contributions, millions of dollars have been generated in grants to CU, several U.S. patents have been secured, and significant donations have been made by private donors and companies.

***Plaintiff's faculty appointment at CU***

43.     In his capacity as Research Associate Professor in CU's Pathology and Bioengineering Departments, Plaintiff has performed extensive research in biomedical imaging, optical, spectroscopy, bioinstrumentation, computer modeling, and nanotechnologies for cancer

---

[2] In June 2020, CU agreed to commit $1,000,000.00 to towards Plaintiff's invention and provided an initial $250,000.00 to put the product together, including associated licensing and hardware. As a result, Preview Medical Inc. ("PMI") was formed, in which CU holds 70% ownership, with the remaining 30% ownership interests distributed among external co-founders and staff. While Plaintiff does not have an ownership interest in PMI, he is entitled to certain royalties relating to its technology.

diagnostics and therapeutics.

44.     As a condition of his employment, Plaintiff agreed to perform his duties and responsibilities consistent with his rights and responsibilities as a faculty member and CU's policies and procedures, promulgated by Defendant Board.

45.     Among the policies and procedures is CU's Nondiscrimination Policy (the "Nondiscrimination Policy") and Procedures (the "Nondiscrimination Procedures" and collectively the "Nondiscrimination Policy and Procedures"), which set forth a multitude of promises from CU to Plaintiff with respect to the prohibition against workplace discrimination, retaliation, harassment, and hostile work environment, and specifically the manner in which prohibited conduct must be handled within CU:

    a.  that CU prohibited discrimination, harassment, a hostile work environment, and retaliation, as well as the aiding and abetting of such actions, and that it maintained a defined procedure that it would necessarily follow whenever it received a complaint regarding same;

    b.  that any individuals who violated the Nondiscrimination Policy would be disciplined or subjected to corrective action;

    c.  that any responsible employee who witnessed or received information regarding possible discrimination or harassment would be obligated to promptly report the information to the Office of Equity or his or her designee and that all reports or complaints made pursuant to the Nondiscrimination Policy would be addressed promptly and as practicably as possible after the report is made in accordance with the Nondiscrimination Procedures;

    d.  that its Nondiscrimination Procedures complied with federal and state laws, their implementing regulations, and related federal/state agency guidance and that it was obligated to conduct at least a preliminary inquiry of any related complaints to determine whether the alleged conduct occurred in the context of, or has continuing effects on, a University program, activity or employment;

    e.  that all of CU's faculty, staff and students were prohibited from retaliating against Plaintiff for bringing a report or complaint pursuant to the Nondiscrimination Policy or participating as a witness in an investigation conducted by the OOE and that "Retaliation [would] not be tolerated";

    f.  that CU would properly initiate an investigation, ensure that the investigator

reviews all relevant documents, interviews relevant witnesses, views other evidence as may be available to conduct a full and thorough investigation, and shares all witness testimony with Plaintiff;

g. that should she bring a report or complaint pursuant to the Nondiscrimination Policy, she would have the opportunity to (1) receive timely notice of his/her interview or meeting, (2) present relevant information to the investigator, including evidence and identifying witnesses; (3) have an advisor of his choice present during any interview, (4) review and respond to a summary of the relevant and material facts gathered during the investigation prior to a final determination being made, which such response must be included as part of the investigation by the investigator, (5) receive a copy of the summary of investigative findings at the conclusion of the investigation; and (6) receive, at the conclusion of an investigation, a written report that includes a statement of factual findings and a determination of whether the Nondiscrimination Policy was violated (hereinafter the "Decision");

h. that a "preponderance of the evidence" (more likely than not) standard would be used to determine whether the alleged conduct violated University policies against discrimination and harassment; and

i. that she could appeal the Decision on the grounds that the investigator exhibited unfair bias, failed to conduct a thorough investigation, or issued arbitrary findings and conclusions and that such appeal would be fully, fairly, and objectively reviewed.

46.    Defendant Board's Nondiscrimination Policy states that discrimination occurs when an individual suffers an adverse consequence on the basis of a protected class.

47.    The Nondiscrimination Policy and Procedures were and remain consistent with the Anschutz Medical Campus mission statement, promulgated by Defendant Board, which states, among other things, that CU embraces excellence in elements including learning and scholarship, discovery and innovation, and diversity, respect and inclusiveness.

48.    The Nondiscrimination Policy and Procedures were and remain consistent with Defendant Board's "Regent Law, Article 10", by which Defendant Board ensures that neither CU nor its officials will discriminate on the basis of race, color, national origin, pregnancy, sex, age, disability, creed, religion, sexual orientation, gender identity, gender expression, veteran status, political affiliation or political philosophy in admission and access to, and treatment and

employment in, its educational programs and activities.

49.     Moreover, Plaintiff's employment was and remains renewable at the end of each term and has been repeatedly renewed over the course of twenty-nine (29) years.

50.     Such renewal is consistent with CU's longstanding pattern and practice to renew tenure-track, limited-term appointments annually, or the applicable term, absent a showing of cause for non-renewal.

51.     Upon information and belief, during Plaintiff's employment, no faculty member holding such appointment was ever refused renewal without cause.

52.     This longstanding practice is consistent with Defendant Board's Regents Law and Policies and the Rules of Defendant Board's School of Medicine ("SOM Rules"). Specifically, Article II, Section I of the SOM Rules states that at Plaintiff's request, the Dean or Chancellor or his/her representative must advise her of the reasons that contributed to a recommendation not to reappoint. Further, these Rules afforded Plaintiff the right to appeal to the Privilege and Tenure Committee should he believe that the proper procedures were not followed at any stage of the recommendation or review process.

53.     Of further significance, Regent's Policy 5(B)(1)(C), also states, in no uncertain terms, that Plaintiff's reappointment "shall not be awarded or denied based on **extrinsic considerations** such as [his] expression of political, social, or religious views".

54.     Presently, Defendants have threatened to terminate Plaintiff's employment based upon entirely unsubstantiated and pretextual grounds, and he has been removed from payroll, which will be described more fully below.

55.     Plaintiff is a long-standing faculty member with outstanding credentials, training

and experience.

***Defendants begin efforts to force Plaintiff out of his
employment***

56.     Throughout nearly the entirety of his employment with CU, Plaintiff has obtained full salary support through public grants and private funds.

57.     In Plaintiff's twenty-nine (29) years of employment, CU has only contributed to Plaintiff's salary for a total of five (5) years, during which time public grant funding was lost. Notably, CU's contributions were partial, not full salary support.

58.     In 2014, Defendants Thor and Anderson contended that there had been a longstanding perceived "mismatch" of goal/focus alignment" between Plaintiff's academic work and the Pathology Department, and that Plaintiff had failed to secure sufficient external funding to support Plaintiff's research long-term.

59.     Defendants Thor and Anderson threatened Plaintiff's termination while implicitly accusing Plaintiff of "taking advantage" of Plaintiff's collaborators within the Pathology Department.

60.     Defendants Thor and Anderson also removed Plaintiff from the Pathology Department pay roll that had been briefly paying 30% of his annual salary.

61.     However, this attempt to remove Plaintiff from the Pathology Department backfired as he secured full, 100% salary support, assured via two (2) separate letters of support from Dr. Crawford and Dr. Fernando J. Kim (Chief of Urology at Denver Health Medical Center).

62.     Over the course of the next several years, Defendants Thor and Anderson acknowledged that Plaintiff had either met or exceeded expectations, and although his work was

not completely aligned with that of the Pathology Department, he was a highly-productive, professional researcher and continued to remain self-sufficient in obtaining salary support.

***Defendants withhold Plaintiff's funding, including access and budgetary management of over $2 million in donor funds specifically allocated for his continued prostate cancer research***

63.     In July 2018, Plaintiff's colleague Dr. Crawford began his transition from full-time faculty to an Emeritus Professor position at CU.

64.     To ensure a smooth transition, Dr. Crawford advised CU that the research work that he and Plaintiff had already started must be continued under Plaintiff's direction.

65.     Dr. Crawford further directed that the research funds that he and Plaintiff had generated from private donors, those of which were secured for the express purpose of supporting their prostate cancer research, should remain in UCCC under Plaintiff's budgetary management.

66.     Dr. Crawford also directed that Plaintiff be the next recipient of the E. David Crawford Endowment, valued at $1.7 million as of July 2018.

67.     These directives were and remain consistent with the intent of those persons who have donated the underlying funds.

68.     Specifically, Donors have contributed to prostate cancer research in direct and specific response to presentations made by Dr. Crawford and Plaintiff regarding prostate cancer research.

69.     Donors' contributions are made specifically to funds dedicated to the advancement of prostate cancer research, specifically the translational prostate cancer research of Plaintiff and there is nothing nebulous about the intent of these donors.

13

70.     CU remains obligated to ensure that the funds dedicated to the progress of prostate cancer research be used in accordance with donor intent.

71.     As such, in December of 2018, Dr. Crawford reduced these directives to writing and submitted a transitional proposal to CU (hereinafter "The Proposal"), therein the research grants and endowments were secured for the express purpose of advancing his and Plaintiff's innovative prostate cancer research technology, and that it was critical that the research work continue under Plaintiff's direction.

72.     The Proposal confirmed that, as of December 2018, there was a total of $501,915.00 remaining in donor account balances, all of which was donated for the express purpose of furthering Plaintiff's and Dr. Crawford's prostate cancer research.

73.     The Proposal provides a financial projected analysis covering a sixteen-month period, ending in April 2020, which indicated that the accounts would continue to provide adequate funding to financially support the outstanding projects to completion, including Plaintiff's salary.

74.     Defendants lacked, and continued to lack, the authority to allocate the donor funds in any other direction other than what was intended by the donors.

75.     Despite the clarity of Dr. Crawford's Proposal and follow-up communications, it has been nearly three (3) years, and still, Defendants have refused to adhere to any of the directives set forth therein.

76.     Defendants have failed to effectuate the Proposal and satisfy the donors' intentions.

77.     Additionally, Defendants have refused to appoint Plaintiff as Endowed Chair of the E. David Crawford Endowment.

78.     Defendants have also refused to grant Plaintiff full access to the funds donated

specifically for Plaintiff's prostate cancer research.

79.     Notably, Plaintiff was originally made aware that UCCC would support the Proposal so long as CU's Pathology Department agreed to employ Plaintiff within its department.

80.     However, Defendant Thor refused to employ Plaintiff through the Pathology Department because, allegedly the Pathology Department "lacked the ability to provide administrative oversight".

81.     Plaintiff was directed to refer to UCCC to resolve the issue, and Defendant Thor met with CU's Dean of the SOM, the Director of UCCC, University Counsel, and the Chair of Radiation Oncology to discuss who would receive the remaining donor funds and endowment.

82.     On January 28, 2019, Defendant Thor met with Plaintiff at her office and told Plaintiff that he would not be granted access and budgetary management of the remaining donor funds which exceed $500,000, nor would he be appointed as the new endowed chair of the E. David Crawford Endowment.

83.     In response to this decision, CU's lead donor threatened to revoke its donation if the funds were not properly allocated to Plaintiff to continue his and Dr. Crawford's work.

84.     Following the threat of revocation, the Chancellor of CU Anschutz Medical Campus, Donald M. Elliman Jr., ("Chancellor Elliman") ensured that the donor funds would be properly distributed, stating with no uncertainty that the funds "will be used to continue the work of Priya Werahera, Ph.D. in prostate cancer research" and that it is the University's "duty" to match the donors with what they are passionate about.

85.     A meeting was held on April 4, 2019, during which time CU's Director of UCCC transferred approximately $30,000 to Plaintiff, this being a small and notably depleted portion of

one of the donor accounts.

86.    Expectedly, Plaintiff inquired as to the status of the remaining funds which exceeded $470,000.  In response, the Director of UCCC advised that Plaintiff would not be given control of the remaining funds because Defendant Thor "**did not want [Plaintiff] to get the funds.**"

***Defendant Thor's Actions Demonstrate Her Pretextual and Discriminatory Intentions to Withhold Funds and Impact Plaintiff's Continued Employment.***

87.    Defendant Thor's discriminatory animus toward Plaintiff is palpable and was made apparent through various communications between herself and other employees.

88.    For example, in addition to the comment noted above that was made by the Director of UCCC, which clearly states that Defendant Thor did not want Plaintiff to receive the funds, Defendant Thor explicitly told Dr. Lucia that she was very upset that Dr. Crawford was nominating Plaintiff as the next recipient of his endowment as opposed to Dr. Lucia, who is a younger, white male.  This begets the question of why Dr. Thor did not want Plaintiff, a highly successful researcher who was specifically and inextricably involved in the very research that the funds were meant to be provided for and whose career contribution had been consistent with the intent of the endowment.  There is no cognizable reason that Defendant Thor can posit that can explain why Defendant Thor expressed that she did not want Plaintiff, an older male of Asian descent, to be denied the endowment and the funds, and instead wanted Dr. Lucia, a younger, white male to receive the endowment.  Discriminatory intent is rarely an overt expression, rather there is an inference of discrimination that is implied by Defendant Thor's explicit comments.

89.    The attempt to thwart Plaintiff's unquestionable right to funding, and Defendant Thor's clear personal vendetta against Plaintiff, made it quite apparent that the reasonings given

for Plaintiff's lack of appointment/fund control was and remains pretextual. The prejudicial behavior of Defendant Thor toward Plaintiff is inexplicable, but unquestionably deliberate. **The fact of the matter is that Plaintiff has not been appointed chair nor has he been given control of the funds due to Defendant Thor's personal, discriminatory intent to exclude Plaintiff, who is an older, minority faculty member, from this role.**

90.     While Plaintiff was granted access to $30,000 of these total funds, he has been denied access to the remaining funds, and Defendants have refused to advise Plaintiff as to how the funds have been distributed nor why he has been denied access to the remaining donor funds have been continuously withheld from him.

91.     Defendant Thor's baseless attempt to thwart Plaintiff's right to access and manage the donor funds can only be deemed as a pretextual cover-up of underlying discriminatory animus. The prejudicial behavior of Defendant Thor toward Plaintiff is deplorable and deliberate.

92.     Given Defendant Thor's baseless decision and repeated refusal to revisit the issue, Dr. Crawford has followed-up with numerous CU officials, requesting that this decision be reversed in order to ensure that the intent of the donors is met and that the critical work continue.

93.     Dr. Crawford has emphasized the fact that CUs credibility would be compromised if the funds were improperly redirected.

94.     Simply put, Plaintiff has not been appointed endowed chair nor has he been given control of the funds due to Dr. Thor's discriminatory intent to exclude Plaintiff, who is an older, minority faculty member, from this role.

95.     However, rather than acknowledging these inappropriate and clearly unlawful actions and inactions, Defendants have engaged in finger-pointing, ignorance, deflection,

retaliation, and have threatened to terminate Plaintiff while having failed to engage in meaningful dialogue concerning this matter.

***Defendant Thor's Discriminatory Animus
is Further Enforced by Her Subordinates.***

96.     As Chair of the Pathology Department, there can be no question that Defendant Thor's supervisory role lends itself to decision making with respect to the terms and conditions of the employees within the Pathology Department.  Moreover, in addition to the explicit authority that comes with a supervisory role, there is an implied authority that would engender Defendant Thor's discriminatory intent to be carried out by her subordinates.

97.     Defendant Thor's second in command, Defendant Anderson, has exhibited similar discriminatory behavior toward Plaintiff, further evidencing and reinforcing discriminatory animus towards Plaintiff.

98.     On one occasion, Defendant Anderson entered a reserved conference room while Plaintiff was giving a presentation, and without any justification, interrupted Plaintiff and began questioning Plaintiff in a menacing and authoritative manner.

99.     Defendant Anderson has also publicly ridiculed Plaintiff and projected his animosity towards Plaintiff to other members of the Pathology Department.

100.    In fact, on numerous occasions, Defendant Anderson has spoken to other members of the Pathology Department, including Dr. Lucia, indicating his disdain toward Plaintiff, by simply stating that he does not like Plaintiff.

***Plaintiff is again threatened with termination based
upon a purported lack of funding***

101.    After unlawfully withholding over $2 million in funding from Plaintiff, Defendants have yet again threatened Plaintiff with termination due to a purported lack of funding.  This self-

created problem can only be interpreted as an attempt to whitewash an otherwise discriminatory act.

102.    On January 25, 2021, Plaintiff met with Defendant Anderson, for annual PRiSM Review, whereupon Plaintiff was told that he was doing well and that he had once again **met expectations.**

103.    Following the meeting, Defendant Anderson emailed the "Department of Pathology Faculty Evaluation Internal Form" to Plaintiff and directed that Plaintiff sign same.

104.    In accordance with Defendant Anderson's representations, Plaintiff checked the box indicating, "Meets Expectations", signed the form, and returned the signed form on January 27, 2021.

105.    Defendant Anderson acknowledged receipt of the signed form and did not indicate that there were any issues with respect to the form.

106.    Over four weeks later, **after Defendant Anderson met with Defendant Thor,** Defendant Anderson informed Plaintiff that he would be changing Plaintiff's overall evaluation to "Below Expectations".

107.    There were no prior discussions, warnings, or implications as to this sudden change nor was there any indication that that Plaintiff should have received this lower score.

108.    Instead, Defendant Anderson claimed to have mistakenly omitted marking a specific score on the form and that Plaintiff's major issue related to "the development of a sustained course of funding for a research program".

109.    Despite Plaintiff's objection to this baseless unilateral change, Defendants Thor and Anderson maintained their support of the change to "Below Expectations".

110.    Plaintiff inquired as Defendant Anderson's authority to make this change after having already informed Plaintiff that the latter had met expectations; however, Defendants Thor and Anderson have refused to address the procedural defectiveness.

111.    There was never an indication that Plaintiff's initial score represented by Defendant Anderson and agreed to by Plaintiff was not final.

112.    According to CU's policy, the primary reviewer must assign a final overall performance rating **prior** to asking for the signature from the faculty member.

113.    Defendants Thor and Anderson's failure to comply with CU policy is not only deceitful, unprofessional, and unethical, but was clearly committed in furtherance of their efforts to terminate Plaintiff.

114.    On March 10, 2021, Plaintiff wrote to CU's Dean of the SOM, requesting a meeting to discuss Defendant Anderson's unilateral change.  CU's Dean of the SOM has yet to respond nor even acknowledge the request.

115.    Plaintiff also wrote to Defendant Thor on April 19, 2021, therein carbon copying CU's Dean of the SOM, CU's Associate Dean for Faculty Affairs (who oversees faculty PRiSM evaluations and related issues), and University Counsel to request a meeting regarding the procedural defectiveness of the PRiSM evaluation as well as the purported funding issues.

116.    To date, Plaintiff has not received a substantive response from Defendant Thor as to the procedural defectiveness of the PRiSM evaluation or as to the purported funding issues. Instead, Defendant Thor has simply concluded, without bases, that a score of "below expectations" was warranted, and that the funding issues are beyond her purview.

117.    Significantly, the silence of higher CU officials, including the Dean of the SOM, is

of no surprise as are multiple publicly available complaints lodged by current and former employees which direct or indirectly implicate these officials for facilitating, fostering, and ratifying the unlawful discriminatory conduct within the SOM.

118.    Defendant Board has established a united front with respect to prejudicial, unjust, and inequitable behavior toward its employees.  This is exemplified by Defendant Thor's unwavering support of Defendant Anderson's baseless evaluation change, and other CU officials' intentional silence towards Plaintiff when this act was questioned.

119.    As a result of Defendants written and verbal representations, including those associated with Plaintiff's most recent PRiSM review, it is clear that Defendants intend to deny his continued employment and intend to use the purported lack of funding as a coverup of this otherwise unlawful decision.

120.    As articulated above, it is undisputed that there is substantial funding available to support Plaintiff's salary, of which is being unlawfully withheld and upon information and belief, misappropriated by Defendants.  Defendants attempt to claim that Plaintiff lacks funding, after refusing to provide Plaintiff with the funding to which he is rightfully entitled, is both illogical and nothing more than pretextual coverup.

121.    Plaintiff's situation is starkly juxtaposed with his white male counterparts, whose careers within the department have not been jeopardized and requirements that they obtain funding as a basis for their salary have not been demanded.

122.    Plaintiff has been held to a different standard than that of many of his colleagues; for example, Defendant Anderson, a Caucasian male, has attained and maintains the position of Vice Chair, yet has had no funding for the past five years and his role is strictly limited to

administration.

123.    Similarly, Dr. James Lambert, another Caucasian male in his fifties, is a prostate/breast cancer researcher who has been with CU since 1998.  Since his employment, he has obtained a total of only two grants in the past twenty-three years in support of his research. Despite the same, his career or continued employment have not been placed in jeopardy.

124.    Similarly, Dr. Kathleen Torkko has been with the department since 1994 and is an epidemiologist.  She has received tremendous support from the Pathology Department in spite of not having consistent funding.

125.    Throughout Plaintiff's time at CU, he has seen his Caucasian colleagues maintain their research positions without obtaining significant funding.  Unlike them, other than a brief period of time when 30% of Plaintiff's salary was supported by CU, Plaintiff's entire salary has been derived from grants and donor funding.

126.    Defendant Thor has refused to support transfer of Dr. Crawford's endowment and the remaining donor funds to Plaintiff under the supervision of Pathology Department, which is comprised predominantly of white males, and where, aside from one other individual, Plaintiff is the only Sri Lankan individual.

127.    Plaintiff has prioritized his research and career opportunities and research is on the brink of being available to be utilized worldwide by practitioners and its impact will be far-reaching as it will allow for early detection of prostate cancer.

128.    After dedicating nearly thirty years of Plaintiff's life's work to the development of a medical device, obtaining a patent that is owned by CU, CU intends to thwart is progress, efforts, and accomplishments within CU, under the pretense of not having funding for this project, despite

express indication that the funding made was specifically made for this research.

129.    Upon information and belief, CU has manipulated the subject funds d given that Plaintiff has not been told as to how such funds have been used, once can presume that they have been used for unintended purposes.

## STATEMENT OF CLAIMS

### FIRST CAUSE OF ACTION

(Discrimination and Hostile Work Environment in Violation of Title VII)
Against Defendant Board

130.    Plaintiff incorporates the allegations in paragraphs 1 through 129 as if fully set forth herein.

131.    Plaintiff, as a Buddhist man of Sri Lankan national origin, is a member of the class of persons protected from discrimination on the bases of religion and national origin under Title VII.

132.    Defendant Board, by and through its agents and Defendants Thor and Anderson, engaged in unlawful employment practices involving Plaintiff because he is a Sri Lankan Buddhist.

133.    Defendant Board, by and through its agents and Defendants Thor and Anderson, discriminated against Plaintiff in connection with the terms, conditions and privileges of employment in violation of 42 U.S.C. § 2000e(2)(a).  The effect of these practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his race and religion.

134.    Defendant Board's unlawful employment practices, by and through its agents and

Defendants Thor and Anderson, had a disparate and adverse impact on Plaintiff because of his race and religion.

135.     Defendant Board is responsible and liable for the acts and omissions of its agents and employees, including Defendants Thor and Anderson.

136.     As a result of Defendants' conduct, Plaintiff has suffered damages and losses.

137.     Defendants' conduct was engaged in with malice or with reckless indifference to Plaintiff's federally protected rights within the meaning of Title VII.

**SECOND CAUSE OF ACTION**
(Discrimination Under ADEA)
Against Defendant CU

138.     Plaintiff incorporates the allegations in paragraphs 1 through 137 as if fully set forth herein.

139.     Defendants discriminated against Plaintiff in the terms or conditions of his employment, because of his age, in violation of the ADEA.

140.     Plaintiff's age was the "but for" factor in Defendants' decision to discriminate against Plaintiff.  Defendants also retaliated against Plaintiff in the terms of conditions of his employment, because of his protected complaints of age discrimination.

141.     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has suffered and continues to suffer damages which include the lost funding, reputational damages, and removal from partial salary support, among other things.

142.     Defendants' conduct was willful and intentional.

**THIRD CLAIM FOR RELIEF**
(Fourteenth Amendment Due Process Deprivations Under 42 U.S.C. § 1983)
Against Defendants

143.    Plaintiff incorporates the allegations in paragraphs 1 through 142 as if fully set forth herein.

144.    Based on the foregoing acts and omissions, Defendants, acting under color of state law, have violated the Due Process Clause of the Fourteenth Amendment as made actionable through 42 U.S.C. §1983.

145.    As a result of Defendants' actions, Plaintiff has sustained substantial economic losses, including, but not limited to, salary, bonuses, pensions and other monetary benefits as well as emotional harm and psychological trauma.

146.    Plaintiff has thereby been damaged in an amount yet to be determined.

### FOURTH CLAIM FOR RELIEF
(Fourteenth Amendment Equal Protection Deprivations Under 42 U.S.C. § 1983)
Against Defendants

147.    Plaintiff incorporates the allegations in paragraphs 1 through 146 as if fully set forth herein.

148.    Based on the foregoing acts and omissions, Defendants, acting under color of state law, have violated the Equal Protection Clause of the Fourteenth Amendment as made actionable through 42 U.S.C. §1983.

149.    As a result of Defendants' actions, Plaintiff has sustained substantial economic losses, including, but not limited to, salary, bonuses, pensions and other monetary benefits as well as emotional harm and psychological trauma.

150.    Plaintiff has thereby been damaged in an amount yet to be determined.

### PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, Priya N. Werahera, respectfully requests that this Court enter

judgment in his favor and against Defendants Board, Thor, and Anderson, and order the following relief against them respectively, to the extent provided by law:

A.  Enjoining Defendants from taking any further discriminatory actions against Plaintiff;

B.  Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

C.  Back pay and benefits;

D.  Injunctive and declaratory relief;

E.  Front pay and benefits;

F.  Attorneys' fees and costs of this action, including expert witness fees, as appropriate;

G.  Pre-judgment and post-judgment interest at the highest lawful rate; and

H.  Such further relief as justice requires or the law allows.

Furthermore, Plaintiff specifically prays that Defendant CU be enjoined from failing or refusing to:

(1) provide sufficient remedial relief to make Plaintiff whole for the losses he was suffered as a consequence of the discrimination and retaliation against him as alleged in this Complaint, and

(2) take other appropriate non-discriminatory measures to overcome the effects of the discrimination and retaliation.

## **PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted October 15, 2021

By:    KATZ AND KERN, LLP

_____

Chet Kern
44 Cook Street
Denver, CO  80206
Tel: 303-398-7000
E-mail: ckern@katzandkernllp.com
*Attorney for Plaintiff*

OF COUNSEL

*s/ Julia Wilcox*
*s/ Gregg D. Weinstock*
*s/ Thomas P. Brennan*
*s/ Alexandra Zerrillo*
*s/ Tyler M. Fiorillo*
*s/ Michael P. Diven*

## CERTIFICATION OF GOOD STANDING

I hereby certify that I am a member in good standing of the bar of this Court.

By:     KATZ AND KERN, LLP

Chet Kern
44 Cook Street
Denver, CO  80206
Tel: 303-398-7000
E-mail: ckern@katzandkernllp.com
*Attorney for Plaintiff Colleen K. Dingmann*

OF COUNSEL

*s/ Julia Wilcox*
*s/ Gregg D. Weinstock*
*s/ Thomas P. Brennan*
*s/ Alexandra Zerrillo*
*s/ Tyler M. Fiorillo*
*s/ Michael P. Diven*

## CERTIFICATE OF SERVICE

I certify that on October 15, 2021, I filed the foregoing with the Clerk of Court using the CM/ECF system.

_____
Chet Kern