**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-02776-NYW

PRIYA N. WERAHERA,

     Plaintiff,

v.

THE REGENTS OF THE UNIVERSITY OF COLORADO,
ANN THOR, in her official and individual capacities, and
STEVEN ANDERSON, in his official and individual capacities,

     Defendants.

---

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants the Regents of the University of Colorado ("Board of Regents" or "Board"), Ann Thor ("Dr. Thor" or "Defendant Thor"), and Steven Anderson's ("Dr. Anderson" or "Defendant Anderson" and, collectively, "Defendants") Motion for Summary Judgment (or "Motion") [Doc. 38, filed August 1, 2022]. This Court concludes that oral argument would not materially assist in the resolution of this matter. Upon careful review of the Motion and associated briefing, the docket, and applicable case law, Defendants' Motion for Summary Judgment is respectfully **GRANTED**.

### FACTUAL BACKGROUND

The Court has discussed the factual background of this case in a prior Order, *see* [Doc. 38], and will do so here to the extent necessary to resolve the instant Motion. This action arises from the employment of Plaintiff Priya N. Werahera ("Dr. Werahera" or "Plaintiff") with the University of Colorado ("CU" or the "University"). *See* [Doc. 1 ("Complaint")]. Dr. Werahera is currently employed as a Research Associate Professor and holds joint appointments within the Pathology

and Bioengineering Departments located within the University's School of Medicine at CU's Anschutz Campus in Aurora, Colorado.  [*Id.* at ¶¶ 1, 22–24].  He asserted four causes of action in the Complaint:

    (1)    Discrimination based on national origin, race, and religion, as well as a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), against the Board of Regents (Count I);

    (2)    Discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), against the Board of Regents[1] (Count II);

    (3)    Violation of due process under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, against all Defendants (Count III); and

    (4)    Violation of equal protection under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, against all Defendants (Count IV).

[*Id.* at ¶¶ 130–50].

## PROCEDURAL HISTORY

This case was initiated on October 15, 2021, when Plaintiff filed the Complaint.  [Doc. 1].  On December 23, 2021, Defendants filed a Motion to Dismiss, seeking dismissal of the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim.  [Doc. 23].  Following the close of discovery, Defendants filed the instant Motion for Summary Judgment on August 1, 2022.  [Doc. 38].  Plaintiff responded to the Motion on October 5, 2022, [Doc. 49], and Defendants replied on October 18, 2022, [Doc. 50].

---

[1] In the Complaint, Dr. Werahera purports to assert Count II against "Defendant CU."  [Doc. 1 at 24].  However, CU is not named as a defendant in this action.  *See* [*id.* at 1].

On August 24, 2022, the Court entered an Order granting in part and denying in part the Motion to Dismiss.  [Doc. 44].  Relevant to the instant Motion, the Court's conclusions included the following:

- Insofar as Plaintiff's Title VII disparate treatment discrimination claim under Count I is based on Defendants' refusal to (1) grant Plaintiff access to donor funds or (2) appoint Plaintiff to the Endowed Chair,[2] such claim is time-barred for failure to exhaust administrative remedies, [*id.* at 15, 24];

- The Board of Regents enjoys sovereign immunity, and therefore dismissal without prejudice is appropriate as to Counts II, III, and IV for lack of subject matter jurisdiction, [*id.* at 21, 25]; and

- With respect to Counts III and IV brought against Defendants Anderson and Thor in their official capacities, Eleventh Amendment immunity applies to bar Plaintiff's claims for damages, and those claims must be dismissed without prejudice, [*id.* at 22, 25].

As a result, the following claims remained:

- Count I, insofar as it alleges (1) disparate treatment discrimination based on national origin, race, and religion arising from Plaintiff's 2020 performance evaluation and (2) a hostile work environment theory of discrimination;

- Counts III and IV, insofar as Plaintiff seeks prospective injunctive relief against Defendants Anderson and Thor in their official capacities; and

- Counts III and IV, insofar as those claims are asserted against Defendants Anderson and Thor in their individual capacities.

[*Id.* at 24–25].

---

[2] *See infra* Undisputed Material Facts.

Moreover, in denying in part the Motion to Dismiss and allowing certain claims to remain, the Court explained that it was more appropriate to consider such issues in the context of summary judgment.  *See* [*id.* at 16 (whether Plaintiff's 2020 performance evaluation constitutes an adverse employment action), 18 (the viability of Plaintiff's hostile work environment claim), 23 (the viability of Plaintiff's constitutional claims and Defendants' invocation of qualified immunity)].

It is against this background that the Court now turns to the instant Motion for Summary Judgment.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted).  It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial.  *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  At all times, the Court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."  *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

To satisfy his burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient.  *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. 2022) (explaining that the nonmovant cannot rely on "mere

4

reargument of a party's case or a denial of an opponent's allegation" to defeat summary judgment). In considering the nonmovant's evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). Further, the Court may consider only admissible evidence, *see Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a form that is admissible at trial—only the substance must be admissible at trial, *see Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). For instance, "if th[e] evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

## UNDISPUTED MATERIAL FACTS

The Parties identify numerous disputed and undisputed material facts in their briefing. Based on the record before it, the Court finds that the following material facts are undisputed:

### Plaintiff's Position with the University

1. Plaintiff is an engineer, holding a Ph.D. from Colorado State University. [Doc. 38-1 at 8:13–17; Doc. 38 at ¶ 1; Doc. 49 at 3].

2. He was hired by the University of Colorado School of Medicine in 1996 as a Research Associate. [Doc. 38-2; Doc. 38 at ¶ 2; Doc. 49 at 3].

3. In 2004, Plaintiff was appointed a research assistant professor. [Doc. 38-3; Doc. 38 at ¶ 1; Doc. 49 at 3].

4. In 2012, Plaintiff was promoted to a research associate professor. [Doc. 38-1 at 8:24–9:17, 10:24–11:15; Doc. 38-4; Doc. 38 at ¶ 4; Doc. 49 at 3].

5

5.     Plaintiff's position is housed within the Department of Pathology.  [Doc. 38-1 at 11:18–24; Doc. 38 at ¶ 5; Doc. 49 at 3].

6.     Dr. Ann Thor has been Plaintiff's supervisor and the final reviewer of Plaintiff's annual performance evaluations since approximately 2006.  [Doc. 38-1 at 101:6–14; Doc. 38 at ¶ 8; Doc. 49 at 3].

7.     Dr. Steven Anderson has been the primary reviewer of Plaintiff's annual performance evaluations at least since 2014.  [Doc. 38-1 at 99:1–16, 101:23–103:13, 156:6–7; Doc. 38 at ¶ 9; Doc. 49 at 3].

8.     Plaintiff continues to be employed by the University full-time.  [Doc. 38-1 at 9:15–17; Doc. 38 at ¶ 10; Doc. 49 at 3].

9.     There has been no change in Plaintiff's pay or benefits over the past two years (i.e., since the Motion was filed on August 1, 2022).  [Doc. 38-1 at 9:18–20; Doc. 38 at ¶ 11; Doc. 49 at 3].

10.     It is Plaintiff's responsibility to secure sustained funding to support his position. [Doc. 38-1 at 90:11–14; Doc. 38 at ¶ 13; Doc. 49 at 3].[3]

11.     In 2014, Plaintiff was told by Dr. Thor that he could be terminated if he did not secure external funding for his position. [Doc. 38-1 at 65:16–19, 105:15–20; Doc. 38 at ¶ 17; Doc. 49 at 3].

**The E. David Crawford, M.D. Endowed Professorship**

12.     Dr. E. David Crawford was a Professor in the Department of Radiation Oncology

---

[3] Plaintiff disputes this fact on the basis that "he was told that Dr. Crawford and Dr. Miller would support his salary," [Doc. 49 at 3], but Defendants cite to Plaintiff's deposition testimony, and Plaintiff fails to cite any support for his dispute.  *See Bones,* 366 F.3d at 875.  Thus, the Court deems this fact undisputed.

at the University of Colorado School of Medicine.  [Doc. 38-6 at 1].  He was not a faculty member in the Department of Pathology. Nevertheless, he and Plaintiff collaborated on various projects over the years.  [Doc. 38-1 at 12:3–4, 195:6–11; Doc. 38 at ¶ 18; Doc. 49 at 3].

13.     In 2006, the Department of Radiation Oncology and the University of Colorado Foundation (a Colorado nonprofit corporation) entered into a Memorandum of Use ("MOU") to define the intended use of gifts held in the E. David Crawford, M.D. Endowed Professorship in Urologic Oncology.  [Doc. 38-6 at 1; Doc. 38 at ¶ 19; Doc. 49 at 3].

14.     The MOU provides: "The first professor shall be E. David Crawford, M.D. Future professors shall be selected by the Dean of the School of Medicine and the Chair of the Department of Radiation Oncology." [Doc. 38-6 at 1; Doc. 38 at ¶ 20; Doc. 49 at 3].

15.     The MOU does not say that future professors will be selected by the Chair of the Department of Pathology.  [Doc. 38-1 at 43:19–44:11; Doc. 38 at ¶ 21; Doc. 49 at 3].[4]

16.      The MOU further provides that the gifts "shall be used to provide general program and/or research support in urologic oncology in the Department of Radiation Oncology at the School of Medicine as determined by E. David Crawford, M.D., Professor, with approval of the Chair of the Department of Radiation Oncology."  [Doc. 38-6 at 1; Doc. 38 at ¶ 22; Doc. 49 at 3].

---

[4] Although Plaintiff disputes this fact, *see* [Doc. 49 at ¶ 21], the plain language of the MOU does not provide that future professors will be selected by the Chair of the Department of Pathology, and Plaintiff likewise cannot dispute this fact based on what he claims is "implicit" in the MOU without further competent evidence, *see* [*id.* (arguing "the MOU implicitly provides that University Officials will refrain from obstructing the appointment of future professors otherwise entitled to the endowed chair position")].  *See Koch v. Koch*, 903 F.2d 1333, 1335 (10th Cir. 1990) (finding, on review of an order on summary judgment, that "[w]e will not look beyond the four corners of the contract where the parties have reduced their agreement to written form and the document is unambiguous on its face.").

**Dr. Crawford's Proposal for Private Donor Funds**

17.     In 2018, Dr. Crawford prepared a proposal to facilitate his retirement ("Transition Proposal"). [Doc. 38-1 at 58:19-21; Doc. 38-7; Doc. 38 at ¶ 23; Doc. 49 at 3].

18.     The Transition Proposal outlined how Dr. Crawford proposed to distribute approximately $500,000 in private donor funds and his preference for how Plaintiff and four other employees with whom he had worked closely be transitioned to other University departments after his retirement.  [Doc. 38-7 at 3–6; Doc. 38 at ¶¶ 24–25; Doc. 49 at ¶ 25 (admitting that "Dr. Crawford outlined how the approximately $500,000 in funds were to be distributed and how his team was to be reassigned/appointed positions")].

19.     There is no allocation in the Transition Proposal to cover Plaintiff's salary and benefits.  Rather, Plaintiff would only be given "direction" over certain donor accounts.  In addition, the Transition Proposal does not identify Plaintiff as the person that Dr. Crawford desired to succeed him in the E. David Crawford, M.D. Endowed Professorship role.  [Doc. 38 at ¶¶ 27–28; Doc. 49 at ¶¶ 27–28].[5]

20.     In 2019, Dr. Crawford retired from the University and has no affiliation with the University other than his emeritus status.  [Doc. 38-1at 47:8–14; Doc. 38 at ¶ 29; Doc. 49 at 3].

21.     Plaintiff was notified as early as January 28, 2019, or, at the latest, April 4, 2019, that he would not be given full access to the other three donor funds.  [Doc. 1 at ¶¶ 82, 85–86; Doc. 38 at ¶ 31; Doc. 49 at 3].

---

[5] Plaintiff disputes these facts on the basis that "[t]he Transition Proposal reflects . . . that he be appointed endowed Chair."  [Doc. 49 at ¶¶ 27–28].  However, Plaintiff fails to cite any support for this assertion in the Transition Proposal, and the document indeed states that Plaintiff would be given "direction" over the accounts.  [Doc. 39-7 at 3].  The Court deems these facts undisputed.

**Plaintiff's 2020 Performance Rating**

22.     Dr. Anderson and Plaintiff met on January 25, 2021, to discuss Plaintiff's performance evaluation for the year 2020.  [Doc. 38-9; Doc. 38 at ¶ 34; Doc. 49 at 3].

23.     In his evaluation, Dr. Anderson noted that one of Plaintiff's weaknesses in 2020 was his inability to "sustain[] funding for research."  [Doc. 38-1 at 137:5–10, 139:9–12; Doc. 38-9; ; Doc. 38 at ¶ 35; Doc. 49 at 3].

24.     Another area of concern was that Plaintiff had not clarified for his supervisors the nature of his role with a private company.  [Doc. 38-1 at 137:11–17; Doc. 38-9 at 7; Doc. 38 at ¶ 36; Doc. 49 at 3].

25.     Plaintiff agrees that his supervisors were entitled to such clarification. [Doc. 38-1 at 138:15–19; Doc. 38 at ¶ 37; Doc. 49 at 3].

26.     When Dr. Anderson sent the 2020 evaluation form to Plaintiff for his signature, he had not designated a final rating on the form.  [Doc. 38-9 at 7; Doc. 38 at ¶ 38; Doc. 49 at 3].

27.     Before signing the evaluation, in the section reserved for the Department Chair on the evaluation form, Plaintiff checked the box that he "meets expectations."  [Doc. 38-1 at 146:4–9; Doc. 38 at ¶ 39; Doc. 49 at ¶ 39].[6]

28.     Upon review by Dr. Thor, as the final reviewer and the Department Chair, Plaintiff was given a "Below Expectations" rating.  [Doc. 38-1 at 147:1–10; Doc. 38 at ¶ 40; Doc. 49 at ¶ 40].[7]

---

[6] Plaintiff disputes "the statement that the section was 'reserved' for the Department Chair," and states that "[t]he Section was to be completed by the Department Chair prior to any signature." [Doc. 49 at 4].  The Court finds Plaintiff's dispute to be one of semantics, not of material fact. Therefore, the Court deems this fact undisputed.

[7] Plaintiff disputes the term "review" because "[i]t is unclear what Defendant Thor actually did, other than that she supported Defendant Anderson's unilateral post-signature change to the form." [Doc. 49 at ¶ 40].  This is not a legitimate dispute of fact, especially given Plaintiff's admission

29.     This rating was based on Plaintiff's inability to secure permanent and stable external funding for his position.  [Doc. 38-1 at 111:12–112:12; 120:3–121:1; Doc. 38-9 at 1; Doc. 38 at ¶ 41; Doc. 49 at ¶ 41].[8]

30.     Plaintiff's national origin is Sri Lankan. [Doc. 38-1 at 84:21–22]. His ethnicity is "Sinhalese. I'm an Asian."  [Doc. 38-1 at 85:6–7; Doc. 38 at ¶ 45; Doc. 49 at 3].

31.     He is 64 years old, and his religion is Buddhism.  [Doc. 38-1 at 69:14, 222:2; Doc. 38 at ¶¶ 46–47; Doc. 49 at 3].

32.     Plaintiff does not have "any information" that Dr. Thor made a mention of his national origin in a derogatory manner.  [Doc. 38-1 at 82:5–9; Doc. 38 at ¶ 48; Doc. 49 at ¶ 48].

33.     Plaintiff admits that Dr. Thor personally sponsored another faculty member from Sri Lanka, helping the faculty member obtain asylum and his green card.  [Doc. 38-1 at 82:21–84:17; Doc. 38 at ¶ 49; Doc. 49 at ¶ 49].

34.     Plaintiff does not know of any instance when Dr. Thor referenced Plaintiff's age in a derogatory manner. [Doc. 38-1 at 82:10–12; Doc. 38 at ¶ 50; Doc. 49 at ¶ 50].[9]

35.     Plaintiff cannot identify a single instance of Dr. Thor mentioning Plaintiff's religion in a derogatory manner. [Doc. 38-1 at 82:13–15; Doc. 38 at ¶ 51; Doc. 49 at ¶ 51].[10]

---

that "Dr. Ann Thor has been Plaintiff's supervisor and the final reviewer of Plaintiff's annual performance evaluations since approximately 2006."  [Doc. 38 at ¶ 8; Doc. 49 at 3].

[8] Plaintiff disputes this fact on the basis that this rating "was given as a pretextual reason to harass and ultimately terminate Plaintiff as a result of Defendants [sic] discriminatory animus."  [Doc. 49 at ¶ 41].  However, not only does this dispute contain argument and legal conclusions, but Plaintiff also fails to provide any citation for her assertions.  Accordingly, the Court deems this fact undisputed.

[9] Plaintiff disputes this fact "in the form alleged" but fails to provide any legitimate basis for his dispute.  [Doc. 49 at ¶ 48].  The Court therefore deems this fact undisputed.

[10] *See id.*; *see also* [Doc. 49 at ¶ 49].

36.    On March 12, 2021, Plaintiff filed a charge of discrimination with the EEOC concerning the claims he raises in this lawsuit.  [Doc. 38-12].[11]

## ANALYSIS

In the Motion for Summary Judgment, Defendants argue, *inter alia*, that: (1) Plaintiff cannot come forward with any evidence to support his claim of disparate treatment discrimination under Title VII based on any theory; (2) Plaintiff cannot come forward with evidence to support his claim of hostile work environment; (3) Plaintiff cannot come forward with any evidence to support his § 1983 claims against Defendants Thor and Anderson in their individual capacities; and (4) Defendants Thor and Anderson are entitled to qualified immunity as to Plaintiff's § 1983 claims asserted against them in their individual capacities.  [Doc. 38 at 19].  The Court turns to each of these arguments in turn.

## I.    Count I Against the Board of Regents

As mentioned, Dr. Werahera's cause of action under Count I asserts a Title VII discrimination claim based on two theories: disparate treatment and a hostile work environment. *See* [Doc. 1 at 23].  The Court will address each theory in turn.

### A.    Disparate Treatment

Dr. Werahera contends that he was subjected to disparate treatment based on his national origin, race, and religion in violation of Title VII.  Where, as here, a plaintiff seeks to use circumstantial evidence to show his employer's discriminatory intent, courts employ the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bennett v. Windstream Commun., Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015).  The Parties agree that this standard applies to Dr. Werahera's disparate treatment discrimination claim.  *See* [Doc.

---

[11] *See id.*; *see also* [Doc. 49 at ¶ 50].

38 at 13 (citing *Bennett*, 792 F.3d at 1266); Doc. 49 at 15].  Under that standard, a plaintiff "bears the initial burden to establish [his] prima facie case of . . . discrimination, which varies depending on the type of adverse action the employee alleges was discriminatory." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007); *see also Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) ("[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged.").

In this context, to make his prima facie case, Dr. Werahera must establish that (1) he is a member of a protected class, (2) he suffered an adverse employment action; and (3) the adverse employment action took place under circumstances giving rise to an inference of discrimination. *See Bennett*, 792 F.3d at 1266; *see also* [Doc. 49 at 15 (Plaintiff's endorsement of this test)].  It is Dr. Werahera's burden to prove his prima facie case "by a preponderance of the evidence." *Plotke*, 405 F.3d at 1099; *see also Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008) (explaining that the "elements of a prima facie case under the *McDonnell Douglas* framework are neither rigid nor mechanistic, [and] their purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in [the] plaintiff's favor").  If he establishes his prima facie case of discrimination, the burden then shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the adverse action. *PVNF*, 487 F.3d at 800.  If Defendants are able to do so, "then the burden shifts back to [Dr. Werahera] to show that there is a genuine issue of material fact as to whether [Defendants'] proffered reasons are pretextual." *Id.*

***Prima Facie Case.***  Defendants argue that Dr. Werahera cannot establish the second element of his prima facie case—an adverse employment action.  *See* [Doc. 38 at 13–16; Doc. 50 at 6–7].  The Court respectfully agrees.

For discrimination claims, an adverse employment action "is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (internal quotation marks omitted).  Moreover, "[t]he Tenth Circuit liberally defines the phrase 'adverse employment action.'  Such actions are not simply limited to monetary losses in the form of wages or benefits.  Instead, [courts] take a case-by-case approach, examining the unique factors relevant to the situation at hand." *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (citations omitted); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (establishing that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").  Courts also consider "acts that carry 'a significant risk of humiliation, damage to reputation, and concomitant harm to future employment prospects.'" *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004) (quoting *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986 (10th Cir. 1996)).  However, employment actions consisting of "mere inconvenience[s] or alteration[s] of job responsibilities . . . will not suffice."  *Id.* (quoting *Sanchez.*, 164 F.3d at 532) (internal quotation marks omitted).  Neither will actions resulting in only "[s]peculative harm[s] . . ." *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 936 (10th Cir. 2001).

In his Response, Dr. Werahera identifies three actions which he contends satisfy the second element of his prima facie case: (1) that he "has been prevented from exercising his right to budgetary management of donor funds, which in turn directly affects his ability to continue his groundbreaking prostate cancer research consistent with the donors' intent"; (2) "Defendants have unlawfully altered Plaintiff's 2020 [performance] review, which has tarnished his otherwise

13

exemplary employee profile"; and (3) "[h]e has been threatened with termination based upon a fabricated and pretextual reason and is left in inconsistent job expectations and the looming fear of termination at any moment." [Doc. 49 at 16–17].

First, in its ruling on Defendants' Motion to Dismiss, [Doc. 23], the Court determined that Dr. Werahera failed to exhaust administrative remedies insofar as his disparate treatment discrimination claim is based on Defendants' refusal to grant him access to donor funds. *See* [Doc. 44 at 15, 24]. Accordingly, this conduct cannot form the basis for Plaintiff's Title VII disparate treatment discrimination claim.

Second, with respect to the alteration of Plaintiff's 2020 performance review, Dr. Werahera fails to cite any authority to support his position that such alteration and related negative 2020 performance review constitutes an adverse employment action for the purposes of his disparate treatment discrimination claim. In fact, his argument on this issue in the Response is limited to a single sentence: "Defendants have unlawfully altered Plaintiff's 2020 PRiSM review, which has tarnished his otherwise exemplary employee profile." [Doc. 49 at 16]. In any event, there is no dispute that Dr. Werahera "continues to be employed by the University." [Doc. 38 at 13]; *compare* [*id.* at ¶ 10 ("Plaintiff continues to be employed by the University full-time.")] *with* [Doc. 49 at 3 ("Plaintiff admits to Defendants' paragraphs: 1-11.")].

Further, as Defendants point out, "a negative performance evaluation, without an associated material change in the employment status, does not amount to an adverse employment action under Title VII." [Doc. 38 at 13 (citing *Rennard v. Woodworker's Supply, Inc.*, 101 F. App'x 296, 307 (10th Cir. 2004))]; *see also Kincaid v. Unified Sch. Dist. No. 500, Kansas City*, 572 F. Supp. 3d 1081, 1098 (D. Kan. 2021) (explaining that "a negative performance evaluation *can* amount to an adverse employment action . . . [b]ut typically, this occurs only when the negative

performance evaluation later leads to a materially adverse employment action such as termination or a failure to promote" (citing *Toth v. Gates Rubber Co.*, 216 F.3d 1088 (Table), 2000 WL 796068, at *9 (10th Cir. 2000)); *cf. Haynes v. Level 3 Commun., LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006) ("A written warning *may* be an adverse employment action only if it effects a significant change in the plaintiff's employment status.").

Third, Dr. Werahera claims that "[h]e has been threatened with termination based upon a fabricated and pretextual reason and is left in inconsistent job expectations and the looming fear of termination at any moment." [Doc. 49 at 16–17]. However, he does not identify any facts in the Response, nor does he make any allegations in the Complaint, to support this position. Rather, Dr. Werahera claims that Defendants have "threatened him with termination due to a concocted theory that he lacks external funding to support his salary." [Doc. 49 at 2]; *see also* [Doc. 30 at 11–12 (claiming Defendants "notified [Plaintiff] of his potential termination" or otherwise "threatened" Plaintiff with termination after he questioned his 2020 performance evaluation in February 2021)]. Likewise, in the Complaint, Dr. Werahera alleges generally that he has been "repeatedly threatened with baseless termination," [Doc. 1 at 1], and he makes other similar, broad allegations regarding the same subject. *See* [*id.* at ¶¶ 54, 59, 95, 101].[12] These general allegations of "threatened" termination lack any factual basis in the record, and they do not constitute an adverse employment under the circumstances of this case.

---

[12] The allegations include that "Defendants have threatened to terminate Plaintiff's employment based upon entirely unsubstantiated and pretextual grounds"; "Defendants Thor and Anderson threatened Plaintiff's termination while implicitly accusing Plaintiff of 'taking advantage' of Plaintiff's collaborators within the Pathology"; "rather than acknowledging these inappropriate and clearly unlawful actions and inactions, Defendants have engaged in finger-pointing, ignorance, deflection, retaliation, and have threatened to terminate Plaintiff while having failed to engage in meaningful dialogue concerning this matter"; and "Defendants have yet again threatened Plaintiff with termination due to a purported lack of funding." [Doc. 1 at ¶¶ 54, 59, 95, 101].

To be sure, the Complaint alleges that, in February 2021, Defendant Anderson notified Dr. Werahera that his 2020 performance evaluation rating would be changed to "Below Expectations" because Defendant Anderson "claimed to have mistakenly omitted marking a specific score on the form and that Plaintiff's major issue related to 'the development of a sustained course of funding for a research program.'" [*Id.* at ¶¶ 106, 108]. Dr. Werahera then asserts, without any factual support, that "[a]s a result of Defendants['] written and verbal representations, including those associated with Plaintiff's most recent [performance] review, *it is clear that defendants intend to deny his continued employment and intend to use the purported lack of funding as a coverup of this otherwise unlawful decision*." [*Id.* at ¶ 119 (emphasis added)].

The Court thus understands Dr. Werahera's position regarding possible termination to be as follows: in February 2021, he was "threatened" with termination on the basis that, in conjunction with a lowered performance review, Defendant Anderson informed Dr. Werahera that he had a "major issue related to 'the development of a sustained course of funding for a research program,'" [Doc. 1 at ¶ 108]. Notably, however, Dr. Werahera admits in the Complaint that he has known about this exact funding issue since as early as 2014. *See* [Doc. 38 at ¶ 17; Doc. 49 at 3 (admitting that "[i]n 2014, Plaintiff was told by Dr. Thor that he could be terminated if he did not secure external funding for his position")]; *see also* [Doc. 1 at ¶ 58 ("In 2014, Defendants Thor and Anderson contended that there had been a longstanding perceived 'mismatch' of goal/focus alignment[ ] between Plaintiff's academic work and the Pathology Department, and that Plaintiff had failed to secure sufficient external funding to support Plaintiff's research long-term.")].[13]

---

[13] Indeed, Dr. Werahera similarly alleges that in 2014, at or around the time he learned of the funding concerns, "Defendants Thor and Anderson threatened Plaintiff's termination . . ." [Doc. 1 at ¶ 59].

In any event, Dr. Werahera fails to point to any evidence that supports his general, conclusory assertions that Defendants have threatened him with termination. *See Bones,* 366 F.3d at 875; *Aquilino,* 268 F.3d at 936 ("Speculative harm does not constitute adverse employment action."). Dr. Werahera also fails to provide any factual support for his assertion that he has been "left in inconsistent job expectations." [Doc. 49 at 17]. Significantly, even if Dr. Werahera had identified evidence to support his assertions of threatened termination, he nevertheless fails to cite—and the Court could not identify—any authority to support the proposition that a threat of termination, without more, satisfies the adverse employment action element of a discrimination claim. *See, e.g.*, *Green v. Runyon*, 131 F.3d 151 (10th Cir. 1997) (affirming district court's finding that "as a matter of law, a threatened letter of warning was not an adverse employment action"); *Bennett v. Henderson*, 15 F. Supp. 2d 1097, 1113 (D. Kan. 1998) ("A 'threatened letter of warning,' however, is not an adverse employment action, as a matter of law.") (quoting *Runyon*, 131 F.3d 151)), *aff'd,* 172 F.3d 62 (10th Cir. 1999); *Smart v. Ball State Univ.,* 89 F.3d 437, 442 (7th Cir. 1996) (holding that a negative performance evaluation was not an adverse employment action where employer did not take any other action against the employee); *accord Rennard*, 101 F. App'x at 307.

In sum, Dr. Werahera has failed to meet his burden of establishing his prima facie case for disparate treatment discrimination. Accordingly, Defendants are entitled to summary judgment on this claim.

### B.     Hostile Work Environment

Title VII's prohibition of discrimination includes a plaintiff's claims of a hostile work environment. *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007). Courts have recognized that "Title VII does not establish a general civility code for the workplace. Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in

American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris v. City of Colo. Springs*, 666 F.3d 654, 663–64 (10th Cir. 2012) (internal quotes and citations omitted).

To survive summary judgment on a claim alleging a hostile work environment, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1327 (10th Cir. 2004) (internal quotation marks and citation omitted). In addition, the plaintiff "must also produce evidence from which a rational jury could infer that she was targeted for harassment because of" his membership in a protected group. *Id.* More specifically, as relevant here, to carry his burden at the prima facie stage, a plaintiff must establish the following four elements:

> (1) []he is a member of a protected group; (2) []he was subject to unwelcome harassment; (3) the harassment was based on [national origin, ethnicity, age, or religion]; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.

*Harsco Corp. v. Renner,* 475 F.3d 1179, 1186 (10th Cir. 2007) (alteration in original) (quoting *Dick v. Phone Directories Co.,* 397 F.3d 1256, 1262 (10th Cir. 2005)). "'The applicable test for a hostile work environment has both objective and subjective components. A dual standard asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended,' and both must be proved." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012).

However, "there is not, and by its nature cannot be, a mathematically precise test" for a hostile work environment claim. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). Courts

determine whether an environment is hostile or abusive by looking at such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. "[T]he severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact." *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1098 (10th Cir.1999) (internal quotation marks omitted); *E.E.O.C. v. PVNF, L.L.C.,* 487 F.3d 790, 798 (10th Cir. 2007) (same).

In his Response, Dr. Werahera purports to identify "numerous examples of harassment" as follows:

> [1] Defendants made false accusations against him to substantiate a threat of termination; [2] Defendant Anderson took vindictive action against Plaintiff; [3] Defendant Thor refused to approve Plaintiff's access to donor funds and appointment as endowed chair; [4] Defendants improvidently altered Plaintiff's 2020 PRiSM Review.

[Doc. 49 at 14 (citations omitted)]. Dr. Werahera also insists that the above conduct "is all juxtaposed with the treatment of Plaintiff's white male counterparts." [*Id.*]. He further claims that "[t]here are also Department Surveys that reflect ongoing discrimination by Defendants Thor and Anderson." [*Id.*]. Based on the foregoing, Dr. Werahera urges the Court to sustain his hostile work environment claim because "it is for the trier of fact to determine whether the aforementioned acts . . . are 1) based on [P]laintiff's race, religion, and/or country of origin, and 2) sufficiently severe or pervasive so as to constitute a viable claim." [*Id.* at 15].

For their part, Defendants argue, *inter alia*, that Dr. Werahera cannot identify any conduct that he experienced that was based on his national origin, ethnicity, age, or religion. [Doc. 38 at 12; Doc. 50 at 4–6]. Defendants also contend that, even accepting as true Plaintiff's claims of harassing conduct, none of the instances identified by Plaintiff rise to the level of severe or

pervasive conduct necessary to state a hostile work environment claim.  [Doc. 38 at 12].  Again, the Court respectfully agrees with Defendants.

First, the Court has already addressed Dr. Werahera's claims of "threatened" termination above, finding that he fails to provide any evidentiary support for such assertions.  Second, Dr. Werahera's claim that "Defendant Anderson took vindictive action" against him, [Doc. 49 at 14], is based on a single instance in 2008 or 2009 when Dr. Anderson entered a conference room where Plaintiff was giving a presentation and interrupted Plaintiff—for which Dr. Anderson "profoundly apologized" later.  [Doc. 38-1 at 105:21–106:25].  Dr. Werahera fails to explain how, and the Court does not find that, a single incident from 2008 or 2009 supports a hostile work environment claim more than a decade later.  *See* [Doc. 1].  Third, Dr. Werahera further fails to explain how, and the Court disagrees that, the refusal of access to donor funds, not appointing him the endowed professorship chair, and the altering of his 2020 performance review rise to the level of severe or pervasive conduct to support a hostile work environment claim.

Fourth, Dr. Werahera fails to make any legitimate argument that any of the above conduct was based on his national origin, ethnicity, age, or religion.  Rather, he asserts, in cursory fashion, that the four purported "examples of harassment" identified in his Response are  "juxtaposed with the treatment of Plaintiff's white male counterparts."  [Doc. 49 at 14].  But even that argument is insufficient.  Specifically, Dr. Werahera identifies three purported "counterparts" as follows: (1) "Defendant Anderson, a Caucasian male, [who] has attained and maintains the position of Vice Chair, yet has had no funding for the past five years and his role is strictly limited to administration"; (2) "Dr. James Lambert, another Caucasian male in his fifties, [who] is a prostate/breast cancer researcher who has been with CU since 1998" and has obtained only two grants to support his research since the start of his employment but "his career or continued

20

employment have not been placed in jeopardy as the Department of Pathology has continued to fund his salary"; and (3) Dr. Kathleen Torkko, who has worked in the Pathology Department as an epidemiologist since 1994 and "received tremendous support" despite "not having consistent funding." [Doc. 49 at 11, ¶¶ 46–48].  However, Plaintiff's general assertions regarding the amount of funding or other benefits Drs. Anderson, Lambert, or Torkko have received do not explain how Plaintiff was entitled to the same such funding or benefits, or how Plaintiff was treated differently based on his protected categories.  Indeed, by Dr. Werahera's own admission, Defendant Anderson holds a different position from Plaintiff, Vice Chair, which is "strictly limited to administrati[ve]" responsibilities; Dr. Lambert holds a "researcher" position, while Plaintiff is a "Research Associate Professor"; and Dr. Torkko is an epidemiologist whereas Plaintiff performs research "for cancer diagnostics and therapeutics."  *See* [*id.*].

Under these circumstances, the Court finds that Dr. Werahera fails to meet his burden of establishing his prima facie case of discrimination based on his theory that he was subjected to a hostile work environment.  Accordingly, Defendants are entitled to summary judgment as to Count I.

## II.     Counts III and IV Against Defendants Anderson and Thor

Dr. Werahera asserts Counts III and IV against Defendants Anderson and Thor (collectively, "Individual Defendants") in their official and individual capacities, pursuant to § 1983, for deprivations of due process and equal protection, respectively, in violation of the Fourteenth Amendment.  *See* [Doc. 1 at 24–25].  As discussed above and in the Court's prior Order on Defendants' Motion to Dismiss, *see* [Doc. 44], Counts III and IV remain *only* insofar as they (1) seek prospective injunctive relief against Defendants Anderson and Thor in their official capacities, and (2) are asserted against Defendants Anderson and Thor in their individual capacities.  *See* [*id.* at 25].

In the Motion, Defendants argue that Plaintiff cannot come forward with any evidence to support his claims under Counts III and IV. *See* [Doc. 38 at 16–18]. Defendants also contend that the Individual Defendants are entitled to qualified immunity on the grounds that Plaintiff "cannot establish any constitutional violations." [*Id.* at 19]. The Court first turns to Defendants' qualified immunity arguments.

***Qualified Immunity.*** The doctrine of qualified immunity protects government officials from individual liability in the course of performing their duties so long as their conduct does not violate clearly established constitutional or statutory rights. *Washington v. Unified Gov't of Wyandotte Cnty.*, 847 F.3d 1192, 1197 (10th Cir. 2017). To overcome an invocation of qualified immunity at summary judgment, although the Court reviews "the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden." *Felder ex rel. Smedley v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) (internal quotations and citation omitted). That is, the plaintiff must establish two things: "(1) that the defendant's action violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions." *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018) (citing *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)). This test imposes a "heavy two-part burden." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted). "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017). It is within the sound discretion of a court to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A. **Count III: Fourteenth Amendment Due Process Deprivations Under 42 U.S.C. § 1983**

Dr. Werahera fails to address his due process claim under Count III at all in his Response. Instead, he discusses only his equal protection claim under Count IV. *See* [Doc. 49 at 18–20]; *see also* [Doc. 50 at 8 n.2]. Accordingly, because Dr. Werahera has not even attempted to meet his burden to establish a federal constitutional or statutory right he claims Defendants Anderson's and Thor's actions violated, and because he bears the burden of proof on this issue, Defendants Anderson and Thor are entitled to qualified immunity with respect to Plaintiff's due process claim under Count III.

B. **Count IV: Fourteenth Amendment Equal Protection Deprivations Under 42 U.S.C. § 1983**

Defendants seek summary judgment on Plaintiff's equal protection claim on statute of limitations grounds and on the basis that Plaintiff cannot establish his claim. The Court will address each argument in turn.

***Statute of Limitations.*** Defendants argue that Dr. Werahera's equal protection claim is barred by the two-year statute of limitations for § 1983 claims insofar as Plaintiff's claim is based on the requirement that Plaintiff "obtain sustained funding to support his position . . . [because] Plaintiff admits that he has known, since at least 2014, that failure to secure external funding could lead to his termination." [Doc. 38 at 17]; *see also* [Doc. 50 at 8]. In the Response, although Plaintiff acknowledges Defendants' argument "that Plaintiff's claims involving access to donor funds . . . are time barred," [Doc. 49 at 15], Plaintiff fails to present any countering arguments on this issue, *see* [*id.*].

"In a § 1983 action, state law governs issues regarding the statute of limitations and tolling, although federal law governs the determination of when a § 1983 action accrues." *Braxton v.*

*Zavaras*, 614 F.3d 1156, 1159 (10th Cir. 2010).  Colorado law prescribes a two-year statute of limitation to § 1983 claims.  *Id.*; COLO. REV. STAT. § 13-80-102.

It is undisputed that "[i]n 2014, Plaintiff was told by Dr. Thor that he could be terminated if he did not secure external funding for his position."  [Doc. 38 at ¶ 17; Doc. 49 at 3].  It is also undisputed that "Plaintiff was notified as early as January 28, 2019, or, at the latest, April 4, 2019, that he would not be given full access to the other three donor funds."  [Doc. 38 at ¶ 31; Doc. 49 at 3].  Dr. Werahera filed the Complaint on October 15, 2021—more than two years after any of the foregoing dates.  [Doc. 1].  Thus, even assuming Defendants' advising Dr. Werahera about the withheld funding constituted an adverse action—which it does not, *see supra* Part I.A.—Plaintiff's equal protection claim is time-barred insofar as the claim is based on this conduct.

***Prima Facie Case.***  The Equal Protection Clause guarantees that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'"  *Soskin v. Reinertson*, 353 F.3d 1242, 1247 (10th Cir. 2004) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).  "The prima-facie case required to support a claim of intentional discrimination under the Equal Protection Clause varies based on the context and nature of the facts."  *Morman v. Campbell Cnty. Mem'l Hosp.*, 632 F. App'x 927, 934 (10th Cir. 2015).

Here, Dr. Werahera cites the following elements: "(1) he belonged to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge."  [Doc. 49 at 17 (citing *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999))]; *see also Kendrick v. Penske Transp. Services*, 220 F.3d 1220, 1226 n.4 (10th Cir. 2000) (explaining that the *McDonnell Douglas* burden-shifting framework applies to

claims under 42 U.S.C. § 1983). Defendants, on the other hand, cite the more general prima facie test for an employment discrimination claim. *See* [Doc. 38 at 16 ("To make out a prima facie case of discrimination, [Plaintiff] must demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees.")].

As a preliminary matter, the Court agrees with Defendants that the appropriate test for an employment discrimination claim under the Equal Protection Clause requires a showing of differential treatment among similarly situated employees. *See Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998) ("In order to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them."). However, the Court need not determine whether Plaintiff has established such differential treatment because Plaintiff and Defendants agree that an adverse employment action is also a necessary element of Plaintiff's prima facie case. *See* [Doc. 49 at 17; Doc. 38 at 16]. And, as discussed above with respect to Plaintiff's Title VII disparate treatment discrimination claim, Dr. Werahera fails to establish the adverse employment action element of his prima facie case.

Nevertheless, here, Dr. Werahera argues that he can meet the third element of his prima facie case—i.e., "despite his qualifications, he was discharged"—on the basis that "he has been notified of forthcoming termination." [Doc. 49 at 17]. However, there is no dispute that Dr. Werahera remains employed by the University. *See* [Doc. 38 at 3 ¶ 10; Doc. 49 at 3]. And, again, Dr. Werahera does not provide any factual support for his argument that being "notified of forthcoming termination" constitutes an adverse employment action.

Under these circumstances, Plaintiff's equal protection claim under Count IV fails. Accordingly, the Defendants Anderson and Thor are entitled to qualified immunity on this claim.

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)      Defendants' Motion for Summary Judgment [Doc. 38] is **GRANTED**;

(2)      Defendants are entitled to their costs pursuant to Federal Rule of Civil Procedure

54(d) and D.C.COLO.LCivR 54.1; and

(3)      The Final Pretrial Conference set for December 12, 2022 is **VACATED**.


DATED:  October 27, 2022                    BY THE COURT:

                                            _____
                                            Nina Y. Wang
                                            United States District Judge